Filed 12/30/22  P. v. Solomon CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094286 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE003568) |
| v. | |
| LAKQUAN DAMARDEUWA SOLOMON, | |
| Defendant and Appellant. | |

Defendant Lakquan Damardeuwa Solomon appeals from the judgment entered after his conviction by jury of first degree murder, discharge of a firearm from a vehicle, and possession of a firearm by a felon.  As relevant to this appeal, the jury also found true gang enhancement allegations associated with the murder and firearm counts.  Defendant contends statutory changes and case law developments require reversal of the gang findings and related enhancements.  He further argues the trial court's refusal to bifurcate the trial on the gang enhancements requires reversal of both those enhancements and the

1

substantive charges to which they attached. The People agree that the gang enhancements imposed pursuant to Penal Code section 186.22[1] must be reversed, but argue against reversal of the firearm enhancements and any of defendant's substantive offenses.

We agree with the parties that legislative changes retroactively applicable to defendant's case require that we vacate the section 186.22 enhancements, subject to retrial on remand. The jury's remaining verdicts and findings are unchanged. Further, we find the failure to apply the newly enacted bifurcation procedure found in section 1009 was harmless. Accordingly, the matter will be remanded for possible retrial of the gang enhancements. The judgment is otherwise affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The People's amended information charged defendant with first degree murder (§ 187, subd. (a)—count one); discharge of a firearm from a vehicle (§ 26100, subd. (c)—count two); and being a felon in possession of a firearm. (§ 29800, subd. (a)(1)— count three.) The information further alleged that counts one and two had been committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)) and that during the commission of these counts, a principal had personally and intentionally discharged a firearm causing great bodily injury. (§ 12022.53, subds. (d) & (e)(1).)[2] Finally, the information alleged defendant had been convicted of a serious felony (§ 667, subd. (a)) and had suffered a prior strike. (§ 667, subds. (b)-(i).)

Before trial, the trial court denied defendant's request to bifurcate the gang enhancement allegations, finding that the People's theory of the case included gang

---

[1] Undesignated statutory references are to the Penal Code.

[2] The information also alleged, as to count one only, violations of subdivisions (b) and (c) of section 12022.53.

motivation and bifurcating the gang evidence would improperly restrict the People's presentation of their case. Thereafter, the matter, with the exception of the status enhancements, was tried by a jury.

A.    *The murder and general investigation*

At trial, the People presented evidence that the victim, Brandon Campbell, stored some of his belongings at the home of J. Johnson in South Sacramento. In September 2017, South Sacramento was experiencing a lot of gang violence. On September 27, 2017, Johnson and Campbell planned to meet up. Campbell got off work around 8:47 p.m. Campbell was to get some marijuana and then go to Johnson's house, since she had a headache and did not want to pick him up, as had been originally planned. Johnson fell asleep waiting for Campbell and awoke to a loud bang. She got out of bed and looked out her window, which did not face the street, but did not see anything. Around this time, approximately 3:00 a.m. on September 28, she received a phone call from Campbell. There was no one on the line when she answered the phone, and Campbell did not respond when she texted him. Unaware that anything was wrong, Johnson got back in bed. Approximately four minutes later, she was told Campbell had been shot, and she called 911.

On the night in question, D.B. lived with Johnson and had her upstairs bedroom window open. Through that window she heard a car drive past, and Campbell speaking with a male whose voice she did not recognize. That voice said, "Ayy," or "[H]ey." D.B. then heard the car turn around, and the voice again said, "[H]ey."[3] D.B. could not hear the specifics of the conversation. She then heard a loud bang and the car left. D.B. thought it was a gunshot, so she dropped to the floor and made her way downstairs to the

_____

[3]    D.B. had some familiarity with older vehicles because she had family members who were auto mechanics, and opined the vehicle had been an older car of some kind, and definitely was not a truck or SUV.

living room. She looked outside and saw Campbell lying in the street and his bicycle on the sidewalk in front of the house. She went outside and saw him take a few breaths before he stopped breathing.

The ShotSpotter system detected a single gunshot in that area at 3:00 a.m. on September 28, 2017, and officers were dispatched to the scene.[4] Campbell was still lying in the street when officers arrived at 3:09 a.m. and, following attempts to resuscitate him, he was pronounced dead at the scene at 3:20 a.m. Campbell had suffered a gunshot wound to his left shoulder, which appeared to be caused by a shotgun fired at close range. Campbell's cell phone, wallet, and a backpack containing, among other things, an airsoft gun and marijuana, were found near his body. There was a skid mark behind the tire of Campbell's bicycle consistent with a sudden stop.

Campbell's autopsy confirmed he died of a shotgun wound to the left shoulder and that there was no soot or stippling as would be expected if the barrel had been close to the skin when fired. Triple-aught shotgun pellets in a tight grouping were recovered from his body. A shotgun "wad" recovered near the body was consistent with 12-gauge ammunition. The wad's placement was consistent with a close-range shooting.

Surveillance camera footage from near the scene showed the victim riding his bicycle at 2:57 a.m. Around this time, that footage also showed a maroon Buick LeSabre that made a U-turn and then sped away 12 seconds after the ShotSpotter identified a gunshot. The driver was wearing a black shirt with a white circle and the letter "C" in the middle. On the back passenger side of the Buick was a spare tire. Less than a minute after the shooting, the Buick turned from the street where the shooting occurred onto Franklin Boulevard. Authorities tracked the Buick's route with traffic cameras, which

---

**4** The ShotSpotter system detects the location of a gunshot to within the width of a football field.

4

showed it heading in the direction of defendant's home. The license plate was collected from a plate reader on Florin Road.

In order to link the Buick to defendant, the People presented evidence that the Buick was registered to defendant's mother and, nine days before the murder, defendant had been in an accident while driving that car. Further, defendant was recorded on September 27, the day before the murder, arriving at a tire store in Vacaville in the Buick and then at a gas station in Hercules with D. Carter. Defendant was wearing a black hooded sweatshirt with the word "Cookie" in white letters and a white circle with the letter "C" in black. Defendant changed the rear passenger tire after his significant other, K. Williams,[5] brought him a spare and defendant left the gas station in the Buick at approximately 10:39 p.m. The parties stipulated Williams told authorities that defendant was the individual in the Cookie sweatshirt in Hercules and admitted this shirt looked similar to the shirt from surveillance footage near the murder. She also identified the car in the surveillance footage as belonging to defendant.

The People further presented evidence that after September 28, the Buick's license plate was not read again by a plate reader until November 20, 2017. On that day, authorities located the Buick and surveilled it. Around noon that day, defendant and Williams arrived where the Buick had been left in North Sacramento and attempted unsuccessfully to start it with a new battery. They left in the vehicle in which they had arrived and were pulled over by an officer, who collected their phones. A search of the Buick revealed (1) a receipt from a tire company with defendant's name, address, and phone number; (2) a red light camera ticket with defendant listed as the driver, including a photo of defendant driving; and (3) a San Francisco parking ticket dated the day of the homicide. The spare tire was still on the car.

---

[5]     Williams and defendant were in a dating relationship, had a child together, and referred to each other as husband and wife even though they were not married.

Forensic testing on the Buick showed the highest concentration of gunshot residue on the driver's side headliner, although testing could not determine when it was deposited there. Residue in that location suggested a gun was fired from the car. The Cookie sweatshirt was not recovered in police searches, nor did a search of defendant's home produce a shotgun or shotgun shells. However, police did find a bag in defendant's bedroom with the same Cookie emblem as the sweatshirt.

B. *The gang evidence*

In accordance with the People's theory that the crime was a retaliatory gang killing, the People called Detective Justin Saario with the Sacramento Police Department to testify as an expert concerning "African[-]American gangs, specifically the Oak Park Bloods." Detective Saario recounted the history of the three main "Bloods" gangs in the Sacramento area and their related subsets. This included the ongoing rivalry between neighborhoods claimed by the different gangs. Defendant was a member of the area's largest gang, the Oak Park Bloods.[6] The primary enemy of the Oak Park Bloods was the G-Mobb, which claimed the area of G-Parkway. Campbell grew up in G-Parkway and Detective Saario considered him an associate of that gang.

The Oak Park Bloods and the G-Mobb had been feuding for at least 20 years. However, gang violence had increased in the years leading up to the homicide at issue in the case, and there was an active gang war in the summer of 2017 requiring Oak Park Bloods members to be armed. If such members were in rival gang territory, they were likely to conduct drive-by shootings. Gang-related violence was prevalent in South

---

[6] While defendant denied his continued membership, Detective Saario based his opinion that defendant was a current member on his review of reports, as well as defendant's tattoos, associations, social media, jail calls, and information retrieved from defendant's cell phone.

Sacramento in September 2017. The location of the murder established that it occurred in G-Mobb territory in South Sacramento.

To demonstrate these hostilities, Detective Saario described a series of gang-related shootings occurring in 2016 and 2017 suspected to have been committed by warring gangs. Included with these was a murder on July 12, 2017, wherein Keyshawn Deams (a validated member of the Oak Park Bloods) was shot in a house by someone in a black vehicle. Deams exited the house, shooting back. Defendant heard this shooting from a few houses away and took Deams to the hospital in the Buick. Further, on September 26, 2017, a home invasion robbery by T.W., D. Walker (a validated Oak Park Bloods member), and B. Stewart went awry when the homeowner shot T.W. and Stewart, resulting in T.W.'s death.

Detective Saario opined the primary activities of the Oak Park Bloods included robbery, weapon possession, burglary, and various shooting offenses, including assault with a deadly weapon, attempted murder, murder, and shooting into an inhabited dwelling or vehicle. Detective Saario further testified to two predicate offenses by the Oak Park Bloods. First, on June 2, 2013, Q.C. was convicted of assault by force likely to produce great bodily injury and sale of methamphetamine with a gang enhancement. Second, on March 21, 2014, T. Patterson was convicted of being a felon in possession of a gun. Finally, based upon a hypothetical partially mirroring the facts of this case, Detective Saario opined the murder would benefit the Oak Park Bloods because, as an act of retaliation committed in rival territory, it would respond to the previous disrespect by the rival gang and would increase the reputation of the Oak Park Bloods gang and show they were capable of carrying out such attacks.

C.     *Further evidence of motive and defendant's knowledge of the shooting*

In addition to the expert gang evidence discussed above, the People presented evidence that T.W., who was killed September 26, 2017, was defendant's 15-year-old friend. The next morning, which was also the day before the murder, defendant texted

7

Williams, stating his " 'little bro' " had been killed during a robbery and he had " 'been stressing.' " At 11:45 p.m. on September 27, Williams asked defendant to call her so that she would know he made it home safely. However, they did not have any communication until 10 a.m. September 28, and shortly thereafter defendant texted her to "[c]heck Fox 40 shooting by Valley Hi," and then added, "[t]his morning."[7] Following a short conversation, Williams again texted defendant, relating that she did not need to know everything but that she wanted to know he was alright. The murder was in the area of Valley Hi.

Thereafter, Williams searched Facebook for the victim on September 29, 2017, and defendant searched Google for the Valley Hi shooting four times between September 28 and 30, 2017. Carter, who was with defendant the day of the murder and a validated Oak Park Bloods gang member, also tried to livestream Fox News at 3:45 a.m. approximately 45 minutes after the shooting and before homicide detectives had even been dispatched to the scene. Defendant also communicated with U. Williams, a validated Oak Park Bloods gang member. While some content was missing, the People recovered messages from U. Williams the day before the murder forwarding pictures from social media showing a rival gang member claiming responsibility for T.W.'s death and otherwise disrespecting defendant's gang.

Finally, the People presented evidence of videos from defendant's phone.[8] One taken the day before the murder showed defendant with Carter rapping about the death of T.W. while using gang slang and displaying a handgun. Another video from August 22,

---

[7] A review of defendant's phone records showed his phone had either been turned off or had a dead battery between 11:45 p.m. on September 27, 2017, and 5:53 a.m. on September 28, 2017.

[8] In addition to linking defendant to the Buick and guns/ammunition, this evidence aligned with Detective Saario's testimony that Oak Park Bloods members post on social media to taunt and disrespect their rivals.

2017, showed defendant rapping inside the Buick with a box of 12-gauge shotgun shells in view.

### D. *Shotgun evidence*

Presumably to show that defendant had access to a shotgun, the People presented evidence that in August 2015, defendant was seen brandishing a sawed-off shotgun on a regional transit train. Defendant fled the train, but was followed by a sheriff's department helicopter and ultimately contacted by an officer when he entered a hotel room. A search of that room revealed an unloaded short-barreled 12-gauge shotgun found within a backpack that also contained defendant's Social Security card. Defendant admitted a friend had given him the shotgun for protection, but denied showing it to anyone on the train.

Further, defendant's ex-girlfriend R. Jackson told authorities in August 2017, and again after Campbell's murder, that defendant brandished a shotgun during an argument with her. However, at trial, Jackson denied that he had possessed a gun during the August 2017 argument. Detective Todd Culp confirmed speaking with Jackson, who had told him that defendant pulled out a pistol-gripped shotgun from a closet during the altercation with her in August 2017.

In their closing argument, the People theorized defendant committed premeditated retaliatory murder. Campbell was killed by defendant, who was in rival gang territory looking to avenge T.W.'s murder. Further, the surveillance footage and the witness testimony showed the person driving the Buick killed Campbell. Finally, because defendant wore the distinctive Cookie sweatshirt, he was identifiable as the person driving the car and thus had committed the murder.

The jury found defendant guilty on all counts and found true the gang and firearm enhancement allegations, including that defendant had personally and intentionally discharged the firearm proximately causing the death of the victim. (§ 12022.53, subd. (d).)

9

Defendant's bifurcated court trial on the sentencing enhancements and sentencing were both held on the same day. The trial court determined the prior strike and serious felony enhancements were true. The court then denied defendant's request for probation, as well as his request to strike the prior strike allegation, but did strike the prior serious felony enhancement. The court sentenced him to an aggregate term of 10 years, plus 75 years to life in prison. This sentence was calculated as follows: 25 years to life for count one, doubled because of the prior strike, plus 25 years to life for the section 12022.53, subdivision (d) enhancement, plus 10 years determinate for the gang enhancement. The court imposed but stayed sentences for the remaining counts pursuant to section 654. Defendant timely appealed, and appellate briefing in this matter was completed on August 22, 2022.

DISCUSSION

I

*Assembly Bill No. 333 (2021-2022 Reg. Sess.)*

A.    *The gang enhancements*

As recently explained by the California Supreme Court in *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*): " 'In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) to eradicate "criminal activity by street gangs." ' [Citation.] Among other things, the STEP Act created 'a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (. . . § 186.22, subd. (b)(1)).' [Citation.]

"In 2021, the Legislature passed Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022. Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.)

10

Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*Tran, supra*, 13 Cal.5th at pp. 1205-1206.)

"Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*Tran, supra*, 13 Cal.5th at p. 1206.)

Here, the parties agree, and we concur, that the jury's true findings associated with the section 186.22 gang enhancements cannot stand in light of the legislative changes brought about by Assembly Bill No. 333 (Assembly Bill 333). These ameliorative changes apply retroactively to defendant's pending case on appeal (*Tran, supra*, 13 Cal.5th at pp. 1206-1207), and neither of the two predicate offenses proffered by the People occurred within three years of the pending charged offense as required. (*Id.* at p. 1206; § 186.22, subd. (e)(1).) Accordingly, we will vacate the jury's true findings for the

11

section 186.22 gang enhancement allegations and remand the matter for the People to determine whether to retry them under the amended law.

B.　　*Section 1109*

Defendant further argues newly enacted section 1109 requires reversal of both his enhancements and the convictions attached thereto.  We disagree.  While there is a split of authority on the retroactivity of section 1109 (*Tran, supra*, 13 Cal.5th at p. 1208), we need not decide that issue because we conclude that even if section 1109 applied retroactively, any error in failing to bifurcate was harmless.

As explained in *Tran, supra*, 13 Cal.5th at page 1208, the trial court's failure to bifurcate does not constitute structural error requiring automatic reversal.  Nor do we believe that it would be appropriate to assess the failure to bifurcate utilizing the *Chapman*[9] standard for federal constitutional error because, under the circumstances of this case, that failure did not result in a trial that was " 'fundamentally unfair.' " (*Tran*, at p. 1209.)  Accordingly, like the high court in *Tran*, we will weigh the possible prejudice of the trial court's failure to apply section 1109 for state law error under *People v. Watson* (1956) 46 Cal.2d 818.  (*Tran*, at p. 1209.)

Here, defendant has not shown it is reasonably likely that the jury would have come to a different result had the gang enhancements been bifurcated.  "[N]othing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132.)  Before trial, the court denied defendant's motion to bifurcate the gang enhancements, highlighting that the People's theory of the case included gang motivation and finding that bifurcating the gang evidence would improperly restrict the People's presentation of their case.  Thereafter at trial, and as

---

**9**　　*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

described in detail *ante*, the People presented evidence intended to establish that defendant committed the murder in rival gang territory in retaliation for the killing of his friend and fellow gang member T.W. the day before. Consistent with this evidence, the People argued in closing that defendant had committed premeditated retaliatory murder. Campbell was killed because defendant, in rival gang territory, was looking to avenge T.W.'s murder. Moreover, the gang evidence presented at trial that was not relevant to the People's theory of motive was minimal and unlikely to have impacted the result.

Further, a review of the remaining evidence presented against defendant does not suggest a reasonable probability that the jury would have come to a different result. Rather, compelling surveillance video and witness testimony established defendant was driving the Buick down the street where the shooting occurred, made a U-turn in that vehicle, and then fled the scene following the ShotSpotter alert. That Buick was later determined to contain gunshot residue, suggesting a gun was fired from the car.

Moreover, defendant's companion in the Buick that night attempted to livestream news of the shooting within 45 minutes of the murder, and incriminating text messages between defendant and Williams, as well as their social media activity, suggested defendant's involvement in the murder. Against this backdrop, the jury determined defendant *personally* and intentionally fired the firearm killing Campbell. Accordingly, we find defendant has not shown it is reasonably likely the jury would have reached a different outcome had the gang enhancement been bifurcated, and thus, we conclude that reversal of defendant's substantive convictions is not warranted.

C.     *The firearm enhancements*

We finally address defendant's argument that this court must vacate the firearm enhancements because the section 12022.53, subdivision (e) allegation relies upon defendant's participation as a principal in a gang-related offense. We disagree that it is necessary to vacate any more of the jury's findings.

13

Section 12022.53, subdivision (e) provides: "(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d). [¶] (2) An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

As relevant to defendant's argument here, the jury found true the allegations that "defendant was a principal in the [murder and shooting from a vehicle], and in the commission of the offense, at least one principal intentionally and personally used a firearm, and proximately caused death to Brandon Campbell." This finding complied with section 12022.53, subdivision (e)(1)(B)'s requirement that "[a]ny principal in the offense committed any act specified in subdivision (b), (c), or (d)" and is unchanged by Assembly Bill 333's amendments. Thus, there is no need to vacate this finding, even though we have concluded that we must vacate the gang enhancement findings necessary for the trial court to sentence defendant under section 12022.53, subdivision (e). Because the trial court sentenced defendant under section 12022.53, subdivision (d), not subdivision (e), we need not and will not vacate the firearm enhancement portion of his prison sentence.

## DISPOSITION

The jury's true findings on the section 186.22 gang enhancements associated with counts one and two are vacated and the matter remanded to allow the People to elect whether to retry defendant on those enhancements. If the People elect not to do so, the trial court shall modify the abstract of judgment accordingly and forward a certified copy

14

to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                   _____KRAUSE_____, J.


We concur:


_____HULL_____, Acting P. J.


_____DUARTE_____, J.